**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CATHY WOLFF, MARY SUE BULGER, PAULA KORANDA, AND CINDY POE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:26-cv-09318 |
| ASCENSION HEALTHCARE, PRIME HEALTHCARE SERVICES, INC., and ST JOSEPH'S MEDICAL CENTER – JOLIET, LLC | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

1. Plaintiff nurses Cathy Wolff, Mary Sue Bulger, Paula Koranda, and Cindy Poe seek compensatory and punitive damages against Defendants Ascension Healthcare ("Ascension"), Prime Healthcare Services, Inc., ("Prime") and St. Joseph's Medical Center – Joliet, LLC, an Illinois corporation. Plaintiffs seek such damages for intentional infliction of severe emotional distress, or willful and wanton conduct toward Plaintiffs that is in reckless disregard of the health of Plaintiffs. By severe understaffing of nurses to meet the needs of their patients, Defendants have caused the Plaintiff nurses to suffer fatigue, burnout and other physical symptoms. Plaintiffs seek such damages from Defendants' deliberate and systematic failure to staff enough nurses to meet the minimally safe nurse-to-patient ratios for St. Joseph Medical Center in Joliet, Illinois, as Defendants have a statutory duty to do under Illinois law, including

the Nurse Staffing by Patient Acuity Act, 210 ILCS 86/10.10, and the Hospital Report Card Act, 210 ILCS 86/15.

2. By the same unlawful acts, Defendants Ascension, Prime and St. Joseph's Medical Center – Joliet, LLC, during their relevant periods of ownership and operation of St. Joseph's Hospital Center, disregarded the staffing ratios developed by the nursing care committee required under 210 ILCS 85/10.10(d) of the Nurse Staffing by Patient Acuity Act by not putting them in effect or simply disregarding the committee process itself. This Illinois statutory process of developing standards through a nursing care committee under 210 ILCS 85/10.10(d) and as described in Illinois Administrative Code title 77.250.1150 is intended to set forth the minimum number of nurses required for each patient care unit.

3. As set forth below, Defendants deliberately failed to provide or enforce minimal safe staffing in willful and wanton disregard of their conduct on the health of Plaintiff nurses and otherwise engaged in conduct that is an aggravated form of negligence. As a result, Defendants have inflicted fatigue, burnout and severe emotional distress on the Plaintiffs and other nurses, who work or have worked in gratuitously unsafe conditions endangering themselves and their patients.

4. By endangering the lives of patients through severe understaffing and forcing Plaintiffs and other nurses to watch helplessly as the needs of their patients are ignored, the Defendants have engaged in conduct that is unethical, immoral, and in reckless and cruel disregard of the health of the nurses. Worse, to inflict further emotional distress, Defendants have made clear that Plaintiffs cannot control or are helpless to control or remedy this conduct.

5. To emphasize how little control Plaintiffs have, or the ability to protect themselves or their patients, the Defendants have ignored hundreds of "assignments despite objection" forms also known as "ADOs" submitted by Plaintiffs and other nurses. In doing so,

Defendants are fully aware that they are forcing Plaintiffs and other nurses into situations where Plaintiffs could not provide adequate care for their patients because of understaffing, so as to create feelings of guilt and anxiety.

6. For these reasons, such deliberate understaffing is a form of intentional infliction of emotional distress or willful and wanton conduct that is inherently cruel and in reckless disregard of the health of the nurses. By inflicting severe emotional distress on Plaintiffs, in this manner, including fatigue and burnout, Defendants are liable to Plaintiffs for compensatory and punitive damages.

**PARTIES**

1. Plaintiff Cathy Wolff is a senior registered nurse presently employed at St. Joseph Medical Center in Joliet, Illinois, and is a resident of Will County, Illinois.

2. Plaintiff Mary Sue Bulger is also a senior registered nurse presently employed at St. Joseph Medical Center in Joliet, Illinois, and is a resident of Will County, Illinois.

3. Plaintiff Paula Koranda is a senior nurse formerly employed at St. Joseph Medical Center for 52 years and is a resident of Will County, Illinois.

4. Plaintiff Cindy Poe is a nurse formerly employed at St. Joseph Medical Center in 2023 and part of 2024 and is a resident of Kane County, Illinois.

5. Defendant Ascension Health is a corporation under Missouri law and doing business in Illinois, including owning and operating St. Joseph Medical Center in Joliet until the sale of that hospital to Defendant Prime.

6. Defendant Prime Healthcare Services, Inc., is a corporation with its headquarters in Ontario, California and owns St. Josephs Medical Center – Joliet LLC, a subsidiary which operates St. Joseph's Medical Center.

7. Defendant, St. Joseph Medical Center – Joliet LLC, is an Illinois corporation and

wholly owned subsidiary of Defendant Prime which was established to operate St. Joseph's Medical Center in Joliet.

## FACTS

**Kathy Wolff**

1. Kathy Wolff is a registered nurse assigned to the dialysis unit at St. Joseph Medical Center ("St. Joseph").

2. She has been employed at St. Joseph under various owners for over 20 years.

3. In the dialysis unit, she treats and provides nursing care to both intensive care unit and stable patients.

4. Each unit at St. Joseph has specialized care for which that nurse is qualified and has a specific nurse to patient ratio developed pursuant to Illinois law.

5. The Hospital Report Card Act 210 ILCS 86/15 (a), is one statute that imposes such an obligation, and states in part: "The number of registered professional nurses, licensed practical nurses, and other nursing personnel assigned to each patient care unit shall be consistent with the types of nursing care needed by the patients and the capabilities of the staff."

6. The Nurse Staffing by Patient Acuity Act, 210 ILCS 85/10.10(d), is another such statute and requires Defendants to "implement a written hospital-wide staffing plan, prepared by a nursing care committee," where "55% of the members are registered professional nurses providing direct inpatient care."

7. Any plan adopted pursuant to the Patient Acuity Act must be based on patient acuity (severity of illness/intensity of care needed) rather than just raw numbers. The plan must consider patient turnover, the skills of the relevant personnel and specialized technology and equipment that is available.

8. A crucial feature of the plan is a mechanism for nurses to report instances where

the staffing plan is not followed, and the nurse is assigned despite objection to the understaffing.

9. The two statutory schemes provide for minimum ratio's direct care professional register nurse to patient staffing needs for each inpatient unit.

10. The Patient Acuity Act further provides for the careful development of a staffing plan which is significantly based on the view of the active nurses who are on the nursing care committee.

11. Defendants Ascension and Prime have consistently disregarded the nursing care committee's recommendations as to the ratios for each care unit and then disregarded or systematically breached even the lower standards that the chief nursing officer of the Defendants chose to adopt.

13. Defendants have treated these ratios, already dangerously low, as meaningless, and systemically staffed the various patient units at an even lower level.

14. Defendants have treated the mechanism for reporting violations as meaningless and have systematically ignored the ADOs signed by Plaintiffs and other nurses, until many nurses have stopped filing them.

15. The approach taken here has led to shocking instances of understaffing, including the dialysis unit.

16. For example, only two nurses, Plaintiff Wolff and Melody Ryan, have been assigned to the dialysis unit at various times in the past.

17. Defendants have instead substituted technicians for work done by nurses.

18. However, the technicians can do only part of what nurses are trained and qualified to do, and both Wolff and Ryan have far more work than two nurses can safely handle. For example, most of the patients are critically ill with conditions such as extreme kidney failure, which has life or death consequences.

19. For the repeated protests of unsafe conditions, Defendants have treated Wolff and Ryan as troublemakers and acted in disregard of their concerns and would have engaged in discipline but for their union membership.

20. Plaintiff Wolff often works well past legal limits on her working hours, because at least one qualified nurse must be present if only to keep the patient alive.

21. Plaintiff Wolff often sleeps only four to five hours each night because of her long hours of work.

22. Two other nurses left the dialysis unit and their employment because of the unsafe staffing levels and the deaths of their patients.

23. Wolff and Ryan have held firm on the number of patients for a nurse in dialysis should be no more than 2 to 1, as all these patients have extreme kidney failure.

24. Plaintiffs Wolff and Ryan, while antagonizing the defendant employers, have been partly able to resist reprisals by Defendants because they have union protection.

25. But both nurses continue to suffer harm from the willful and wanton conduct of Defendants in violating the staffing required by Illinois law.

26. During night shifts, Wolff, for example, is often alone with the patients, and it is elementary patient safety that a nurse should never be left alone in these circumstances.

27. For Wolff and Ryan, the physical and emotional stress from the understaffing in the dialysis unit is likely to increase, as Defendant Prime is now attempting to have a ratio of one nurse for three patients in dialysis for kidney failure instead of just two.

**Mary Sue Bulger**

1. Plaintiff Mary Sue Bulger is a registered nurse who has worked at St. Joseph's Medical Center for 32 years.

2. Plaintiff Bulger sometimes works as a charge nurse in the 2W telemetry unit, and with 32 years of experience is highly qualified to be preferred as a charge nurse in the unit.

3. At various times Defendant Prime has used nurses with approximately just two years of experience to serve as the charge nurse because such less experienced nurses cost less.

4. Plaintiff Bulger also serves on the staffing and acuity committee at St. Joseph's Hospital.

5. While Defendants have ignored and tried to prevent the committee from performing its statutory role, the existence of the patient and acuity committee on which Plaintiff serves is required by Title 77 of the Illinois Administrative Code, section 250.1130. The committee has to develop nurse staffing standards under detailed statutory requirement, but Defendants Ascension and Prime have turned the committee into a nullity, so that in addition to the severe and dangerous understaffing of the St. Joseph's Hospital the willful disregard to of the Nurse Patient Acuity Act has created a sense of hopelessness, and despair, and is intended to humiliate and demoralize the nurses like Plaintiff Bulger and others.

6. Defendants pay little or no attention to the standards offered by the nurses and set the ratios or "grids" however they please, with no meaningful input from the nurses.

7. In the case of Plaintiff Bulger, on her own floor in telemetry, the two employers have consistently decreased the ratios or "grids" from 3 to 4 patients per nurse to 5 to 6 patients per nurse.

8. Especially with only two nurse technicians in telemetry, the ratio of one nurse to 5 to 6 patients is constant because the nurses have to take up the slack.

9. One nurse per 5 to 6 patients on a continuous basis is not feasible or safe on Plaintiff Bulger's floor in telemetry because the patient needs are greater than other units and the patients require more attention.

10. By 2025 in Plaintiff Bulger's unit, there were only seven nurses, one charge nurse (or lead nurse) and usually just one nursing technician for approximately 30 patients.

11. Because of such deliberate understaffing, Plaintiff Bulger suffers emotional distress and is often unable to sleep out of worry. She is in constant apprehension that her license is in danger because of patient falls or harm because medication cannot be delivered in the proper time frames.

12. As a result, Plaintiff Bulger and other nurses suffer severe emotional distress from feelings of helplessness and guilt that accumulate over time as their patients fall because nurses on the floor cannot get to them fast enough.

13. Plaintiff Bulger and other nurses face severe distress because the understaffing delays timely delivery of medications to their patients and turning over bed- ridden patients to prevent sores and other complications.

14. Defendants have inflicted more distress by reducing the ratio of nurse technicians, also known as CNAs, from a ratio of one CNA per 7 to 10 patients to one CNA to 15 patients. As a result, the registered nurses like Plaintiff Bulger have even more work than that which comes from reduction of the formal staffing grids for such registered nurses.

15. In addition, Defendants have cut the number of needed transport staff after 5 pm so that nurses, like Plaintiff, on 12 hours shifts must transport patients between departments or for tests.

16. Currently, inflicting further distress of Plaintiff Bulger and other nurses, Defendant Prime – under a business model to maximize profit at the expense of the health of the patients - has discharged patients under their care prematurely, even as the patients and family members say they are not ready to leave. Defendant Prime holds "discharge meetings" pushing for these premature discharges.

17. Defendants Ascension and Prime and St. Joseph's Medical Center – LLC are fully aware of the severe emotional distress they are causing because Plaintiff Bulger and other nurses speak out, attempt to organize, and file hundreds of ADOs.

18. Defendants are also fully aware that their deliberate understaffing has caused a mass exodus of nurses from St. Joseph's Medical Center. In effect Defendants have caused the constructive discharge of these nurses by making work conditions intolerable. Defendants have welcomed these constructive discharges so they can replace more experienced nurses with new hires to whom they pay less.

19. Plaintiff Bulger still suffers emotional distress and often is unable to sleep out of worry and is in constant apprehension that her license is in danger because of insufficient patient care.

**Paula Koranda**

1. While Plaintiff Wolff and Bulger continue their employment at St. Joseph Medical Center, Plaintiff Koranda left in July 2024 involuntarily and was constructively discharged by Defendants because of the intolerable conditions resulting from nurse understaffing by Defendant Ascension and the worse conditions that Plaintiff Koranda foresaw when Defendant Prime assumed ownership in 2025.

2. As Plaintiff Koranda anticipated, the unsafe staffing under Defendant Ascension has become even worse under Defendant Prime.

3. Over the 52 years that Koranda worked at St. Joseph Medical Center, the number of nurses at the hospital has dropped from 550 to 250 nurses overall.

4. In the last four years alone, many senior and highly qualified nurses like Plaintiff Koranda, have left employment at St. Joseph, either entirely or in part because of unsafe staffing under Defendants Ascension or Prime or both.

5. While Defendant Ascension and Prime cannot readily fire senior and better-paid nurses, both Defendants have been able to force out these nurses as Defendant Ascension forced out Plaintiff Koranda by making work conditions intolerable.

6. As senior and better paid nurses are forced out and constructively discharged because they cannot work in these unsafe conditions, the Defendants replace them with new lower-earning nurse graduates.

7. In this manner, Defendants save even more cost by understaffing and acting in willful and wanton disregard of the harm to Plaintiffs and other nurses.

8. Because the new graduates require training, Defendants increase the workload of the senior nurses who stay and force even more turnover and savings from the exodus of experienced nurses.

9. Koranda worked in the “med/surg” surgery unit, which was intended only for patients in or connected with surgery.

10. Prior to Ascension’s ownership of the St. Joseph Medical Center, the nurse-to-patient ratio in the surgery unit where Koranda worked was one nurse to four patients.

11. By July 2024 when she left—and the sale to Prime had been announced—the ratio was one nurse to either five or six and even seven patients.

12. In understaffing Plaintiff Koranda's unit in this manner, Defendant Ascension disregarded the recommendations of the nurse staffing committee set up by the Acuity Act but even the lower standards approved by the chief nursing officer.

13. Apart from the worsening nurse patient ratio, the Defendant Ascension was paying no attention to the acuity model that it is required to have under the same Act.

14. Ignoring the increased acuity that is supposed to be considered under the Act, Defendant Ascension was transferring high risk cardiac and dialysis patients who required more intensive care and did not belong in the surgery unit in the first place.

15. Aside from special and acute needs, the care of these high-risk patients transferred into the unit was outside the specialty or special training of nurses who had staffed the unit.

16. In addition, apart from increasing the nurse-to-patient ratio, Defendant was eliminating nurse support positions, like bed coordinator, and substituting registered nurses like the Plaintiffs for such work in addition to the patient care for which registered nurses are supposed to provide.

17. The worsening nurse-to-patient ratio, while dangerous enough, also fails to account for the efforts of Defendant to hide the real patient count that it was obligated to report.

18 For example, in violation of statutory reporting obligations, Defendant manipulated the patient count by characterizing many patients as "same day" or under 23 hours when in fact the Defendants held these patients overnight.

19. Meanwhile, Defendant Ascension would temporarily close patient units and used these temporary closures to turn nurses temporarily displaced into "floaters" who would go from unit to unit rather than having permanent assignments.

20. By turning nurses into "floaters," Defendant often sent nurses into medical areas outside their line of training and for types of care with which they had no familiarity and continue them in this status even when their assigned units were re-opened.

21. Finally, Defendant Ascension began including the charge nurse, who is supposed to be free of activity duty, into an active-duty nurse, for purpose of deceptively improving the apparent nurse to patient ratio without relieving the charge nurse of her duties as charge nurse of the unit.

22. As a result of the systematic and dangerous understaffing, Plaintiff Koranda, like other nurses at St. Joseph, saw increased infections among patients, increased patient falls, and increased medication errors.

23. Plaintiff Koranda and others felt a sense of helplessness as bystanders because Defendants have impressed upon the nurses that their repeated protests, in forms known as "assignments despite objection" or ADOs, are futile and will be ignored.

24. In turn, because the nurses like Plaintiff Koranda are the frontline caregivers and witness these infections, falls, and medication errors and because they are trapped in dangerous understaffing which is part of a business model that they are powerless to change, Defendants have inflicted on Plaintiff Koranda and on others serious health outcomes, including severe emotional distress, helplessness, sleeplessness, and the medical condition known as burnout, which has caused them to give up their employment.

**Cindy Poe**

1. Plaintiff Cindy Poe had been employed as a nurse by Ascension at another hospital, Resurrection Hospital in Chicago. In January 2023, Plaintiff Poe sought and received a transfer to St. Joseph Medical Center in Joliet.

2. Like Plaintiff Koranda, Plaintiff Poe was assigned to the “med/surg” unit of St. Joseph.

3. Plaintiff chose 7 E (where Plaintiff Koranda worked) because it was the best staffed unit at the time of her transfer, despite being understaffed.

4. Pursuant to the scheme to close units temporarily to turn nurses into “floaters,” Defendant Ascension even closed 7 E temporarily.

5. With no projected reopening date, Plaintiff Cindy Poe became a “floater.”

6. As Plaintiff Poe discovered, the 7 E unit functioned in this case a kind of staffing pool for St. Jospeh.

7. Plaintiff Poe now worked in various units, such as the emergency room, and other units for patient care outside of her specialty and training, which were already understaffed.

8. Defendant Ascension knew that it was highly stressful for Poe and other nurses to become floaters and to work in various units temporarily that were severely understaffed and to provide patient care outside their specialty or for which they were unfamiliar.

9. Nonetheless, despite the enormous stress on Plaintiffs, Defendant Ascension deliberately adopted this model as the way to run a hospital that was intended to be understaffed.

10. For Plaintiff Poe, this included especially the emergency room, which called for specialized nursing skills that Plaintiff did not have, and where Plaintiff Poe would never have applied to work because of the emotional demands it made upon her.

11. Plaintiff Poe protested the assignments to units with unsafe staffing and filed numerous ADOs.

12. Because Plaintiff Poe persisted in filing the ADOs, and did so knowing they would be ignored, she antagonized the Chief Nursing Office of Defendant Ascension.

13. For a case of severe understaffing on May 12, 2024, Plaintiff Poe especially antagonized the Chief Nursing Officer because she filed not just an ADO with Ascension but also a complaint with the Illinois Department of Public Health.

14. As to the case in question, on the morning of May 12, 2024, there were no day-shift nurses to relieve Plaintiff Poe and other nurses who were on night shift in at least three separate patient care units.

15. The night-shift nurses, including Poe, though not obligated to stay and exhausted after 12-hour shifts, had no choice but to stay because Defendant Ascension had no nurses to relieve them.

16. Plaintiff now filed her complaint with the Illinois Department of Public Health, citing Defendant for extreme understaffing.

17. For once, the Illinois Department of Public Health, which typically ignores these complaints regarding St. Joseph, chose to cite Defendant Ascension but imposed no serious penalty.

18. However, Defendant Ascension's Chief Nursing Officer was already upset with Plaintiff for repeated protests at being assigned to the chaotic and understaffed emergency room.

19. The immediate supervisor of Plaintiff Poe warned her that Plaintiff ought to resign because Defendant Ascension intended to discipline Plaintiff on one pretext or another but actually in reprisal for her protests of unsafe staffing.

20. Emotionally drained and exhausted by experiences like May 12, 2024, and fearing reprisal from Defendant because of her protests of unsafe staffing, Plaintiff then left her employment at St. Jospeh's involuntarily.

21. Plaintiff Poe submitted her involuntary resignation on July 7, 2024.

## CLAIMS

**Count I: Intentional Infliction of Emotional Distress or Wanton and Willful Conduct in Reckless Disregard of the Health of Plaintiff Wolff**

1. Paragraphs 1-84 above are incorporated herein by reference.

2. Both Defendants Ascension and Prime and St. Jospeh's Hospital LLC are defendants on this count

3. By the facts set forth above, and the wanton and willful conduct in severe understaffing and placing Plaintiff Wolff in situations of severe understaffing, Defendants Ascension and Prime have intentionally inflicted severe emotional distress upon Plaintiff Wolff or otherwise engaged in willful and wanton conduct to which they are indifferent, refuse to cease, and know is causing needless harm to Plaintiff Wolff emotionally and physically.

4. By such intentional infliction of emotional distress or willful and wanton conduct in reckless disregard of the health of Plaintiff Wolff, and by the facts set forth above, and by systematic and deliberate understaffing of her unit, and refusing all her protests of unsafe conditions, Defendants have caused Plaintiff Wolff to suffer emotional distress, hopelessness, sleeplessness, extreme fatigue, and the medical condition known as burnout which has many physical symptoms.

5. From such intentional infliction of emotional distress or wanton and willful conduct in reckless disregard of the health of Plaintiff Wolff, including the systematic and unconscionable understaffing in a patient care unit for those who are in life-or-death situations with extreme kidney failure, and for the indifference to the harm inflicted on her, Plaintiff is

entitled to compensatory and punitive damages.

WHEREFORE, Plaintiff Wolff prays this Court to:

a. Grant compensatory and punitive damages to Plaintiff Wolff and against Defendants Ascension and Prime for harm suffered by her from their intentional infliction of emotional distress or in the alternative, willful and wanton conduct as described above;

b. Grant such other relief as may be appropriate.

**Count II: Intentional Infliction of Emotional Distress or Wanton and Willful Conduct in Reckless Disregard of the Health of Plaintiff Bulger**

1. Paragraphs 1-109 above are incorporated herein by reference.

2. Both Defendants Ascension and Prime are defendants on this count.

3. By the facts set forth above, and the wanton and willful conduct in placing nurses like Plaintiff Bulger in situations where there is insufficient staffing for adequate care of their patients, Defendants Ascension and Prime have intentionally inflicted severe emotional distress upon Plaintiff Bulger or otherwise engaged in willful and wanton conduct in reckless disregard of her health to which the Defendants are indifferent and which they know is harming Plaintiff Wolff emotionally and physically.

4. By such intentional or willful and wanton conduct, and by the facts set forth above, and by systematic and deliberate understaffing of her unit, and refusing all her protests of unsafe conditions, Defendants Ascension and Prime have caused Plaintiff Wolff to suffer emotional distress, hopelessness, sleeplessness, extreme fatigue, and the medical condition known as burnout which has many physical symptoms.

5. From such intentional or wanton and willful conduct by Defendants toward her, and placing her in situations of severe understaffing, and inflicting upon her needless harm to

which the Defendants are completely indifferent, Plaintiff is entitled to compensatory and punitive damages from Defendants.

WHEREFORE, Plaintiff Bulger prays this Court to:

a. Grant compensatory and punitive damages to Plaintiff Bulger and against Defendants Ascension and Prime for harm suffered by her from their intentional infliction of emotional distress or in the alternative, willful and wanton conduct as described above;

b. Grant such other relief as may be appropriate.

**Count III Intentional Infliction of Emotional Distress or Willful and Wanton Conduct in Reckless Disregard of the Health of Harming Plaintiff Koranda**

1. Paragraphs 1-113 above are incorporated herein by reference.

2. Only Defendant Ascension is the defendant on this count.

3. By such intentional infliction of emotional distress or willful and wanton conduct in reckless disregard of the health of Plaintiff Koranda, and by the facts set forth above, and by systematic and unconscionable understaffing of nurses in patient care units like the "med/surge" unit where Plaintiff Koranda worked, Defendants Ascension intentionally inflicted severe emotional distress upon Plaintiff Koranda or otherwise engaged in willful and wanton conduct harming her emotionally and physically.

4. Any such intentional infliction of emotional distress or willful and wanton conduct in reckless disregard of the health of the Plaintiff Koranda, Defendant Ascension caused Plaintiff Koranda to suffer severe emotional distress, chronic mental and physical fatigue, sleeplessness, and the medical condition known as burnout and caused her involuntarily to leave her employment at St. Joseph Medical Center because of the intolerable staffing conditions.

WHEREFORE, Plaintiff Koranda prays this Court to:

a. Grant her compensatory and punitive damages against Defendant Ascension for

harm suffered from its intentional infliction of emotional distress or willful and wanton conduct in severe understaffing of the patient care units in which she worked and for causing the involuntary termination of her employment;

b. Grant such other relief as may be appropriate.

**Count IV: Unlawful Retaliatory Action Against Plaintiff Poe**

1. Paragraphs 1-91 above are incorporated herein by reference.

2. Only defendant Ascension is defendant on this count.

3. The Illinois Hospital Report Card Act, 210 ILCS 86/35 protects the employment of nurses who complain and others who complain of unsafe nursing staffing, as such unsafe staffing as described above is in violation of Illinois law.

4. By the acts set forth above, and in violation of 210 ILCS 86/35, Defendant Ascension unlawfully threatened retaliatory discipline against Plaintiff Poe.

5. As a result of such threat, Plaintiff Poe involuntarily submitted her resignation to avoid being disciplined in reprisal for her repeated complaints about understaffing.

6. Under 210 ILCS 86/40 and 85/10.10(f), each of which provides a private right of action against Defendant Ascension for such reprisal or threat of reprisal, Plaintiff Poe is entitled to compensatory and punitive damages for involuntary loss of her employment and constructive discharge.

WHEREFORE, Plaintiff Poe prays this Court to:

a. Grant her compensatory and punitive damages for the threat of unlawful retaliatory discipline which led her to submit her resignation and thereby achieved an unlawful discharge;

b. Grant such other relief as may be appropriate.

c. Paragraphs 1-96 above are incorporated herein by reference.

Dated: August 19, 2026

By: /s/ *Thomas H. Geoghegan*
Counsel for Plaintiffs

Thomas H. Geoghegan (ARDC #3126689)
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com
admin@dsgchicago.com

**Certificate of Service**

I hereby certify that on this date, August 19, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, and was served on counsel of record via email to:

Ryan S. Hedges (rhedges@bakerlaw.com)
Kate L. Jungers (kjungers@bakerlaw.com)
BAKER & HOSTETLER LLP
One North Wacher Drive, Suite 3700
Chicago, IL 60606
Telephone: (312) 416-6200

*Counsel for Defendant Ascension Health*

Katherine H. Oblak
Sheppard Mullin
321 North Clark Street
Ste 32nd Floor
Chicago, IL 60654
Telephone: (312) 499-6300
Email: koblak@sheppardmullin.com

*Counsel for Defendant Prime Healthcare Services Inc.*

By: /s/ *Thomas H. Geoghegan*